**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
SOLIDION TECHNOLOGY, INC                                        :
        Plaintiff                 :
             :   Case No.: 25-CV-10301
             :
  -against-                                                    :   **COMPLAINT**
             :
             :   **JURY TRIAL DEMANDED**
METEORA CAPITAL PARTNERS, L.P., METEORA         :
SELECT TRADING OPPORTUNITIES MASTER, L.P.,      :
METEORA STRATEGIC CAPITAL, LLC, METEORA         :
CAPITAL, LLC, VIKAS MITTAL, JOSEPH LEVY,         :
KEVIN S GAHWYLER, HENRY ROGANO                   :
   Defendant(s).
--------------------------------------------------------------------X

    Plaintiff SOLIDION TECHNOLOGY, INC. ("Solidion") by and through its

attorneys, Schrier Shayne, P.C. as for their Verified Complaint against METEORA

CAPITAL PARTNERS, L.P. ("METEORA PARTNERS"), METEORA SELECT

TRADING OPPORTUNITIES MASTER, L.P. ("METEORA SELECT"), METEORA

STRATEGIC CAPITAL, LLC ("METEORA STRATEGIC"), METEORA CAPITAL,

LLC ('METEORA CAPITAL"), (Collectively "Meteora"), VIKAS MITTAL ("Mittal"),

JOSEPH LEVY ("Levy"), KEVIN S GAHWYLER ("Gahwyler"), HENRY ROGANO

("Rogano") and LOEB & LOEB, LLP ("Loeb"), (collectively, the "Defendants")

respectfully allege the following upon information and belief at all times hereinafter

mentioned:

## THE PARTIES

**1.**  Plaintiff, Solidion Technology, Inc. ("Solidion"), is a company incorporated in the State of Delaware, with its principal place of business at One Galleria Tower, 13355 Noel Road, Dallas, Texas 75240.

**2.**  Solidion is a manufacturer of battery materials and components and a developer of next generation batteries and energy storage systems for electric vehicles for ground, aerospace and sea transportation.

**3.**  Solidion is listed on the Nasdaq under the ticker symbol STI.

4.  Nubia Brand International, Corp. ("Nubia"), was a special purpose acquisition company ("SPAC") incorporated in  Delaware with offices in Dallas, Texas.

5.  Honeycomb Battery Company ("Honeycomb") was a corporation organized under the laws of the State of Ohio and maintained offices in Ohio.

6.  On or about February 15, 2023, Honeycomb and Nubia entered into an Agreement and Plan of Merger pursuant to which Honeycomb would merge with Nubia Merger Sub, Inc. [an Ohio corporation], Nubia would then acquire the merged company and the newly merged company would be called Solidion Technology, Inc. ["Solidion"].

7.  The merger agreement was amended on or about August 25, 2023.

8.  On or about February 2, 2024, the merger was completed, and the newly merged company was named "Solidion Technology, Inc. (" Solidion").

9.  Defendant, Meteora Partners is a Delaware Limited partnership.

10. Defendant Meteora Partners maintains a principal place of business located at 840 Park

Dr. East, Boca Raton, FL. 33432.

11. Defendant Meteora Partners maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432.

12. Defendant Meteora Partners maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

13. Defendant, Meteora Partners is a SEC Registered Investment Advisor.

14. Defendant, Meteora Select is a Cayman Island Limited partnership.

15. Defendant Meteora Select maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 3343215.

16. Defendant, Meteora Select maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432.

17. Defendant Meteora Select maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

18. Defendant, Meteora Select is a SEC Registered Investment Advisor.

19. Defendant, Meteora Strategic is a Delaware Limited partnership.

20. Defendant Meteora Strategic maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

21. Defended Meteora Strategic maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432.

22. Defendant Meteora Strategic maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

23. Defendant, Meteora Strategic is a SEC Registered Investment Advisor.

24. Defendant, Meteora Capital is a Delaware Limited partnership.

25. Defendant Meteora Capital maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

26. Defended Meteora Capital maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432

27.  Defendant Meteora Capital maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

28. Defendant Meteora Capital maintains offices in the State of New York.

29. Defendant, Meteora Capital is a SEC Registered Investment Advisor.

30. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Partners.

31. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Select.

32. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Strategic.

33. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Partners.

34. Defendant, Mittal resided at and still resides in the State of Florida.

35. Defendant, Mittal resided at and still resides in the State of New York.

36. Defendant, Mittal resided at and still resides in the State of California.

37. Defendant, Mittal maintained and still maintains a place of business in Florida.

38. Defendant, Mittal maintains and still maintains a place of business in New York.

39. Defendant, Mittal maintains and still maintains a place of business in California.

40. Defendant, Mittal maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

41. Defendant, Mittal maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

42. Defendant, Mittal maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

43. Defendant, Mittal is a member of Meteora Partners.

44. Defendant, Mittal is a Partner of Meteora Partners.

45. Defendant, Mittal is a managing member of Meteora Partners

46. Defendant, Mittal was a member of Meteora Partners.

47. Defendant, Mittal was a Partner of Meteora Partners.

48. Defendant, Mittal was a managing member of Meteora Partners

49. Defendant, Mittal is a member of Meteora Select.

50. Defendant, Mittal is a Partner of Meteora Select.

51. Defendant, Mittal is a managing member of Meteora Select

52. Defendant, Mittal was a member of Meteora Select.

53. Defendant, Mittal was a Partner of Meteora Select.

54. Defendant, Mittal was a managing member of Meteora Select

55. Defendant, Mittal is a member of Meteora Strategic.

56. Defendant, Mittal is a Partner of Meteora Strategic.

57. Defendant, Mittal is a managing member of Meteora Strategic.

58. Defendant, Mittal was a member of Meteora Strategic.

59. Defendant, Mittal was a Partner of Meteora Strategic.

60. Defendant, Mittal was a managing member of Meteora Strategic.

61. Defendant, Mittal is a member of Meteora Capital.

62. Defendant, Mittal is a Partner of Meteora Capital.

63. Defendant, Mittal is a managing member of Meteora Capital.

64. Defendant, Mittal was a member of Meteora Capital.

65. Defendant, Mittal was a Partner of Meteora Capital.

66. Defendant, Mittal was a managing member of Meteora Capital.

67. Defendant, Mittal is an SEC Registered Investment Advisor.

68. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Partners.

69. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Select.

70. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Strategic.

71. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Capital.

72. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Partners.

73. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Select.

74. Defendant Levy at all times hereinafter mentioned is the chief operating officer of

Defendant Meteora Strategic.

75. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Capital.

76. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Partners.

77. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Select.

78. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Strategic.

79. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Capital.

80. Defendant, Levy resided at and still resides in the State of Florida.

81. Defendant, Levy resided at and still resides in the State of New York.

82. Defendant, Levy resided at and still resides in the State of California.

83. Defendant, Levy maintained and still maintains a place of business in Florida.

84. Defendant, Levy maintains and still maintains a place of business in New York.

85. Defendant, Levy maintains and still maintains a place of business in California.

86. Defendant, Levy maintains and still maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

87. Defendant, Levy maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

88. Defendant, Levy maintains a place of business located at 250 W. 55th Street, Suite

30-a, New York, New York 10019.

89. Defendant, Levy is a member of Meteora Partners.

90. Defendant, Levy is a Partner of Meteora Partners.

91. Defendant, Levy is a managing member of Meteora Partners

92. Defendant, Levy was a member of Meteora Partners.

93. Defendant, Levy was a Partner of Meteora Partners.

94. Defendant, Levy was a managing member of Meteora Partners

95. Defendant, Levy is a member of Meteora Select.

96. Defendant, Levy is a Partner of Meteora Select.

97. Defendant, Levy is a managing member of Meteora Select

98. Defendant, Levy was a member of Meteora Select.

99. Defendant, Levy was a Partner of Meteora Select.

100.    Defendant, Levy was a managing member of Meteora Select

101.    Defendant, Levy is a member of Meteora Strategic.

102.    Defendant, Levy is a Partner of Meteora Strategic.

103.    Defendant, Levy is a managing member of Meteora Strategic.

104.    Defendant, Levy was a member of Meteora Strategic.

105.    Defendant, Levy was a Partner of Meteora Strategic.

106.    Defendant, Levy was a managing member of Meteora Strategic.

107.    Defendant, Levy is a member of Meteora Capital.

108.    Defendant, Levy is a Partner of Meteora Capital.

109.    Defendant, Levy is a managing member of Meteora Capital.

110.    Defendant, Levy was a member of Meteora Capital.

111.    Defendant, Levy was a Partner of Meteora Capital.

112.    Defendant, Levy was a managing member of Meteora Capital.

113.    Defendant, Levy is an SEC Registered Investment Advisor.

114.    Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Partners.

115.    Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Select.

116.    Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Strategic.

117.    Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Capital.

118.    Defendant, Rogano resided at and still resides in the State of Florida.

119.    Defendant, Rogano resided at and still resides in the State of New York.

120.    Defendant, Rogano resided at and still resides in the State of California.

121.    Defendant, Rogano maintained and still maintains a place of business in Florida.

122.    Defendant, Rogano maintains and still maintains a place of business in New York.

123.    Defendant, Rogano maintains and still maintains a place of business in California.

124.    Defendant, Rogano maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

125.  Defendant, Rogano maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

126.    Defendant, Rogano maintains a place of business located at 250 W. 55th Street,

Suite 30-a, New York, New York 10019.

127.    Defendant, Rogano is a member of Meteora Partners.

128.    Defendant, Rogano is a Partner of Meteora Partners.

129.    Defendant, Rogano is a managing member of Meteora Partners

130.    Defendant, Rogano was a member of Meteora Partners.

131.    Defendant, Rogano was a Partner of Meteora Partners.

132.    Defendant, Rogano was a managing member of Meteora Partners

133.    Defendant, Rogano is a member of Meteora Select.

134.    Defendant, Rogano is a Partner of Meteora Select.

135.    Defendant, Rogano is a managing member of Meteora Select

136.    Defendant, Rogano was a member of Meteora Select.

137.    Defendant, Rogano was a Partner of Meteora Select.

138.    Defendant, Rogano was a managing member of Meteora Select

139.    Defendant, Rogano is a member of Meteora Strategic.

140.    Defendant, Rogano is a Partner of Meteora Strategic.

141.    Defendant, Rogano is a managing member of Meteora Strategic.

142.    Defendant, Rogano was a member of Meteora Strategic.

143.    Defendant, Rogano was a Partner of Meteora Strategic.

144.    Defendant, Rogano was a managing member of Meteora Strategic.

145.    Defendant, Rogano is a member of Meteora Capital.

146.    Defendant, Rogano is a Partner of Meteora Capital.

147.    Defendant, Rogano is a managing member of Meteora Capital.

148.    Defendant, Rogano was a member of Meteora Capital.

149.    Defendant, Rogano was a Partner of Meteora Capital.

150.    Defendant, Rogano was a managing member of Meteora Capital.

151.    Defendant, Rogano is an SEC Registered Investment Advisor.

152.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Partners.

153.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Select.

154.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Strategic.

155.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Capital.

156.    Defendant, Gahwyler resided at and still resides in the State of Florida.

157.    Defendant, Gahwyler resided at and still resides in the State of New York.

158.    Defendant, Gahwyler resided at and still resides in the State of California.

159.    Defendant, Gahwyler maintains and still maintains a place of business in New York.

160.    Defendant, Gahwyler maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

161.    Defendant, Gahwyler maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

162.  Defendant, Gahwyler maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

163.    Defendant, Gahwyler is a member of Meteora Partners.

164.    Defendant, Gahwyler is a Partner of Meteora Partners.

165.    Defendant, Gahwyler is a managing member of Meteora Partners

166.    Defendant, Gahwyler was a member of Meteora Partners.

167.    Defendant, Gahwyler was a Partner of Meteora Partners.

168.    Defendant, Gahwyler was a managing member of Meteora Partners

169.    Defendant, Gahwyler is a member of Meteora Select.

170.    Defendant, Gahwyler is a Partner of Meteora Select.

171.    Defendant, Gahwyler is a managing member of Meteora Select

172.    Defendant, Gahwyler was a member of Meteora Select.

173.    Defendant, Gahwyler was a Partner of Meteora Select.

174.    Defendant, Gahwyler was a managing member of Meteora Select

175.    Defendant, Gahwyler is a member of Meteora Strategic.

176.    Defendant, Gahwyler is a Partner of Meteora Strategic.

177.    Defendant, Gahwyler is a managing member of Meteora Strategic.

178.    Defendant, Gahwyler was a member of Meteora Strategic.

179.    Defendant, Gahwyler was a Partner of Meteora Strategic.

180.    Defendant, Gahwyler was a managing member of Meteora Strategic.

181.    Defendant, Gahwyler is a member of Meteora Capital.

182.    Defendant, Gahwyler is a Partner of Meteora Capital.

183.    Defendant, Gahwyler is a managing member of Meteora Capital.

184.    Defendant, Gahwyler was a member of Meteora Capital.

185.    Defendant, Gahwyler was a Partner of Meteora Capital.

186.    Defendant, Gahwyler was a managing member of Meteora Capital.

187.    Defendant, Gahwyler is an SEC Registered Investment Advisor.

188.    Defendant, Gahwyler is a certified public accountant.

189.    Defendant, Gahwyler is a certified public accountant licensed in the State of New York.

190.    Defendant, Gahwyler is a certified public accountant licensed in the State of Florida.

191.    Meteora Capital LLC is an affiliate of Meteora Partners.

192.    Meteora Capital LLC is an affiliate of Meteora Select.

193.    Meteora Capital LLC is an affiliate of Meteora Strategic.

194.    Meteora Select is owned in whole or in part by Meteora Capital, LLC.

195.    Meteora Strategic is owned in whole or in part by Meteora Capital, LLC.

196.    Meteora Partners is owned in whole or in part by Meteora Capital, LLC.

197.    Meteora Select is controlled in whole or in part by Meteora Capital, LLC.

198.    Meteora Strategic is controlled in whole or in part by Meteora Capital, LLC.

199.    Meteora Partners is controlled in whole or in part by Meteora Capital, LLC.

## JURISDICTION AND VENUE

200.    This court has jurisdiction over the issues raised in this complaint pursuant to 28 USC §1332 in that the matter in controversy exceeds $75,000 and the Defendants maintain a principal place of business in a state other than the state in which the Plaintiff maintains its principal place of business.

201.    This court has jurisdiction over the issues raised in this complaint pursuant

to 18 USC §1964(c) in that this is an action brought pursuant to 18 USC §§ 1961-1968.

202.    This court has jurisdiction over the issues raised in this complaint in that this is an

action brought pursuant to 15 USC §§17(a), 77q(w), 78(b) and SEC Rule 10(b) and

10b-5.

203.    The venue is properly found in this court pursuant to 28 USC §1391(b) and (c).

204.    The venue is properly found in this court pursuant to 18 USC §1965

### FACTS APPLICABLE TO ALL CLAIMS

205.    On about June 15th, 2021 Nubia was formed as a "Special Purpose Acquisition
        Company" (hereinafter a "SPAC") in Delaware.

206.    A SPAC is a shell corporation listed on a stock exchange with the purpose of

acquiring or merging with a private operating company with results being that the

operating company is publicly traded on an exchange.

207.    On about March 11th, 2022 Nubia was first listed on the NASDAQ

exchange.

208.    The proceeds of the sale of Nubia stock was deposited in a trust account.

### THE SCHEME:

209.    Defendants are in the business of Funding SPAC companies.

210.    Typically, after a SPAC company acquires and or merges with a private

operating company, the newly merged company from time to time will require operating

capital with the expectation that the shares listed on the public market can be sold to

provide capital to the company.

211.    Defendants are in the business of funding companies that are newly operating

after a merger with a SPAC company

212.    As a practical matter a newly listed company on a stock exchange will require capital to fund its expansion and growth.

213.    Generally funding for the expansion of a business comes in the form of either capital contribution by selling shares or in the form of a loan.

214.    Based upon the foregoing, Defendants devised a "funding scheme" to satisfy the requirements of the cash flow needs of a listed company following a merger between a non-listed/private operating company and a SPAC.

215.    Step I of the funding scheme devised by Defendants required the Defendants to purchase shares of the SPAC prior to the merger.

216.    Step II of the funding scheme devised by Defendants required the post merged company to have a limited supply of unrestricted shares that could be sold in the market.

217.    Step III of the funding scheme devised by Defendants required the newly merged post SPAC company to return to Defendants 100% of the money that was spent by Defendants prior to the merger to acquire the shares of the SPAC, thereby giving Defendants a zero-cash basis for all the acquired stock.

218.    As  part of Step III of Defendants' scheme, notwithstanding the return of 100% of the money Defendants' spent to acquire the shares of the SPAC, Defendants retained "legal ownership" of the shares essentially as collateral security for the future money to be paid by Defendants to the newly merged company and further required the issuance of "restricted" shares to be issued by the newly merged company without further compensation.

219.    Step IV of the funding scheme devised by Defendants required the Defendants to

periodically sell shares it held as collateral security and remit part of the sales proceeds to the newly merged company.

220.     As part of Step IV of Defendants' scheme, the parties pre-agreed on a "strike price" or "reference price" that would be paid to the newly listed merged company upon the sale of any portion of the stock which was being held by Defendants and Defendants would retain the remainder as their profit.

221.     As part of the Step IV calculation, in reaching the "strike price" Defendants also had to make a calculation of how many shares of stock could be sold without driving the price downward based upon the supply of shares available to be sold (which is often referred to as the "float").

222.     Step V of the funding scheme devised by Defendants, permitted the Defendant to sell shares of unrestricted stock on the listed exchange at any price but requiring defendant to pay to the newly merged company the "strike price" per share.

223.     As a practical matter, it is assumed that Defendants would sell shares above the "Strike Price" otherwise Defendants would bear a loss on each sale of shares.

224.     The result of the foregoing scheme was that the newly merged company would receive cash for expansion without incurring debt.

225.     In addition to the foregoing, Defendants devised a "Step VI" of the Funding scheme in the event the stock price went below the pre-designated strike price.

226.     Step VI of the scheme devised by the Defendants permitted payments by Defendants to the newly merged company, usually in increments of $500,000 and Defendants would be contractually permitted to sell a sufficient number of shares that were being held in escrow at the then market price [usually below the "strike price"]

sufficient to repay the money to Defendants that were paid to the newly merged company plus an additional "fee" to be paid to Defendant.

227.    As part of the scheme devised by the Defendants, Defendants would agree to limit the number of shares that it would sell in the market to avoid any stock manipulation in violation of SEC rules and regulations.

228.    Notwithstanding the stated goal of avoiding stock manipulation in violation of SEC rules and regulations, Defendants' required free reign to use their discretion when they could and should sell the stock that was being held as collateral security and the quantity of stock that Defendants were permitted to sell.

229.    To induce Defendants' "Target" company to enter into the proposed "funding" scheme as outlined hereinabove, Defendants' proposed both accountability to the "Target" company and practical financial disincentives to avoid the "cratering" of the stock price of the "Target" company.

230.    The practical financial disincentive to avoid "cratering" the stock price of the "Target" company is the provision in the proposed funding agreement , that regardless of the price at which a share is sold, Defendants would be obligated to pay a pre-agreed "strike price" or "reference price" per share sold.

231.    Based upon the foregoing practical motivation, any reasonable business person would only sell shares at or above the pre-agreed "strike price" or "reference price" in that selling shares below the pre-agreed "strike price" would require payment to the "Target" company of an amount greater than received for the sale of the stock.

232.    The accountability proposed by Defendants to the "Target" companies was the

representation that Defendants would provide a true and accurate reporting of their shareholding in the "Target" Company's shares at any time requested by the "Target" company.

233.    As part of the scheme devised by the Defendants, the "strike price" could be lowered under certain pre-designated events.

234.    Further, notwithstanding the contractual right to have discretion as to the time and number of shares to be sold from the escrowed shares, as part of the scheme devised by Defendants, Defendants would agree to an initial "stand-down period" to allow the price of the stock of the newly traded merged Company to "organically" go up or down from the initial offering price to avoid any SEC violations.

235.    The "trap" for the "Target" company is that by manipulating the price of the Target companies shares, under a number of different complicated set of circumstances, Defendants would claim to have the right to "reset" the "strike price" at a lower price than Defendants had actually sold shares, which would result in a "windfall" to Defendants.

**<u>SOLIDION IS THE SUBJECT OF DEFENDANTS' SCHEME:</u>**

236.    On or about January 24, 2022 Nubia and Meteora entered into a confidentiality agreement in which the parties agreed that Nubia would locate an operating company, merge with that operating company, and Meteora would provide funding in the manner set forth above.

237.    In connection with the original transaction between Nubia and Meteora, defendants recommended that Nubia retain the legal services of Loeb.

238.    Defendant, Meteora represented to Nubia that Loeb had extensive experience in

the contemplated transaction, including but not limited to all the filings and requirements of the SEC and with respect to the rules and regulations regarding the trading of stock on the NASDAQ exchange.

239.    Defendant Meteora did not disclose to Nubia that in the past Loeb had represented Meteora in other transactions.

240.    At Meteora's  recommendation, Nubia retained the legal services of Loeb in connection with its transaction with Meteora.

241.    Loeb did not disclose to Nubia that it had previously represented Meteora.

242.    A confidentiality agreement was entered into between Nubia and Meteora.

243.    The confidentiality agreement was in fact a "prepackaged" funding agreement to enable Nubia to acquire and or merge with an operating company.

244.    Prior to February 15, 2023 Nubia identified Honeycomb as a business suitable for a merger and/or an acquisition that fit into the finance structure as contemplated in the January 24, 2022 confidentiality agreement between Nubia and Meteora.

245.    Under the guidance of Loeb, as it's Attorney, Nubia entered into a merger agreement with Honeycomb on February 15, 2023.

246.    The merger agreement was amended on August 25, 2023.

247.    Nobia and Honeycomb entered into negotiations with Meteora to fund the business after the merger closed.

248.    On about September 19, 2023 Meteora issued a "term sheet" to Nubia and Honeycomb.

249.    The September 19, 2023 term sheet, among other terms, proposed the following:

    a. Meteora would be the lead investor in the "DESPAC" process;

b.  Meteora with acquire SPAC shares of Nubia from the pre-existing investors;

c.  Meteora would commit to fund the emerged company up to $85 million.

d.  Meteora would provide $1 million in immediate funding post business combination of Nubia and Honeycomb;

e.  There would be an early termination of the funding agreement should the price of the stock trade below four dollars ($4.00) per share for 10 days out of 30 consecutive trading days;

f.  That legal fees and expenses of Meteora were to be paid by the newly merged company but would be capped at $75,000;

g.  Upon the merger, in consideration for all the funds paid by Meteora to the pre-existing investors in Nubia, the newly merge company which transfer all the funds held in the trust by Nubia to Meteora;

h. Shares of the newly merged company would be issued to Meteora for sale in the market and part of the price receive per share would be remitted to plaintiff.

250.    On or about December 7, 2023 Nubia and Meteora entered into a letter agreement in which it was agreed that Meteora would be the exclusive funder of the newly merged company after the "DeSPAC".

251.    On or about December 13, 2023 Nubia, and Meteora entered into a series of agreements in anticipation of the merger between Nubia and Honeycomb.

252.    The relevant terms of those December 13, 2023 agreements are as follows:

a.  A pre-agreed amount of the funds in trust with Nubia would be remitted to Meteora;

b.  Up to 8 million subscriber shares of the merged company would be issued to Meteora to enable Meteora to sell shares in the market and remit funds to the newly merged company;

c.  The issued shares to Meteora, were to be registered with the securities and exchange commission to enable Meteora to sell the securities in the market;

d.  Meteora was required to sell the shares and remit a pre-agreed portion of the sales revenue to the newly merged company.

253.    On February 2, 2024, the merger/business combination between Nubia and Honeycomb was concluded.

254.    The newly merged company was renamed Solidion Technology, Inc., the plaintiff herein.

255.    Before the merger/business combination was completed, all the expenses of the merger were calculated with the assistance of Loeb, which included all expenses of the professionals (including payment to Loeb), and the required repayment to Meteora to substitute itself for the original investors in Nubia.

256.    As a result, it was determined before the merger was implemented that the remaining funds available to the newly merged company would be limited.

257.    By reason of the remaining limited funds after the conclusion of the merger, Loeb was aware that it was essential that application be made as soon as possible following the merger to file the required documents with the SEC to subscribe the shares to be issued to Meteora so Meteora could sell the shares as contemplated by the December 13, 2023 agreements which would provide the necessary funding to enable the newly merged business to operate its business on an ongoing basis.

258.    Upon the merger, the total sum of $23,533,538.15 was "returned" to Meteora pursuant to the agreements executed on December 13, 2023.

259.    On January 17, 2024, Meteora submitted a pricing date notice to request 5,838,537 "additional shares" related to the forward purchase agreement.

260.    Upon the foregoing payment to Meteora from the Nubia trust fund, Meteora had been made whole and therefore was holding the foregoing shares of Plaintiff's stock without remitting any remuneration to the plaintiff.

261.    As required by the agreements of December 13, 2023, Plaintiff was required to register the shares that were issued to Meteora with the SEC so that they could be sold in the market and Meteora would then be required to make payment to the Plaintiff thereby providing the Plaintiff with the capital necessary to operate the newly merged company.

262.    On February 9, 2024, ,  Plaintiff filed the required 8K disclosure  with the SEC to register the shares issued to Meteora as required by the December 13, 2023 agreements with Meteora.

263.    Unfortunately, the cost of the merger exceeded the projected expenses, and Plaintiff was left with little funds remaining post-merger/post-"DESPAC".

264.    As a result, time was of the essence to complete the registration process with the SEC to enable Meteora to begin selling the shares of plaintiff's stock that had been issued to Meteora.

265.    After filing the request for the registration of shares issued to Meteora, Plaintiff was given notice by the SEC that Plaintiff's  financials submitted to the SEC were

"stale" as of February 14, 2024 and Plaintiff was required to submit updated financial statements.

266.    However, Plaintiff did not have the necessary funds to pay the professional fees required to prepare and file new financials as required.

267.    Meteora was advised of the foregoing but refused to advance any funds, notwithstanding the fact that it was holding 5,838,537 shares of Plaintiff's stock.

268.    The situation was further complicated by the fact that pursuant to the February 7, 2023 letter agreement, Meteora had the right to be the exclusive source of funding to the Plaintiff post-merger.

269.    On March 31, 2025 defendant Mittal on behalf of defendants filed a "13-G" statement with the SEC in which he represented that Meteora was holding 9,111,675 shares of Plaintiffs common stock.

270.    Notwithstanding the contractual obligation to Meteora not to obtain funding from any other source, in light of the "catch 22" situation as described hereinabove, Plaintiffs underwriter, E.F. Hutton recommended that the funds necessary could be obtained through a  "PIPE" transaction.

271.    A "PIPE", is also known as a " private investment in public equity" transaction.

272.    PIPE Financing is a way for a public company to raise capital by selling its securities in a private placement to a small group of institutional investors as an alternative to a public offering.

273.    PIPE Financing allows for a faster raise of capital with less paperwork.

274.    To induce the institutional investors to purchase securities in a PIPE transaction, the price per share sold to the small group of institutional investors is usually at a discounted price.

275.    Pursuant to SEC registration rules, the registration of shares process in a PIPE transaction is expedited and allows the investors to resell the acquired shares in the open market.

276.    The PIPE Financing proposed by E.F. Hutton prohibited the filing of any registration statement with the SEC other than a connection with the PIPE financing.

277.    In light of the desperate situation and the need to obtain financing to keep the newly merged business afloat and avoid bankruptcy, the decision was made to obtain funding as suggested by E.F. Hutton.

278.    Upon learning of the plan to raise money through PIPE financing, Defendants, Meteora instituted a lawsuit against Plaintiff on July 16, 2024 in the Delaware Chancery Court (the " Delaware lawsuit").

279.    In the Delaware lawsuit Meteora claimed that Plaintiff had not honored its obligation to register the shares pursuant to the December 13, 2023 agreements and sought specific performance requiring Plaintiff to immediately register the shares.

280.    Meteora alleged that it also incurred monetary damages for the failure of Plaintiff to register the shares, notwithstanding the fact that Meteora had not incurred any expense with regard to the issuance of the shares that it was holding.

281.    The Delaware lawsuit was settled on about August 29, 2024 pursuant to the following terms and conditions:

a.  Defendants would permit the PIPE Financing to go forward;

b.  Defendants would be permitted to participate in the PIPE Financing;

c.  Plaintiff would issue and register shares of  Plaintiffs common stock as provided in the December 13, 2023 agreements;

d. Meteora agreed to advance funds to plaintiff in increments of $500,000;

e.  After each advance to Plaintiff, Meteora was permitted to sell shares on the open market equal to 120% of the amount advanced and retain the additional amount received;

f. Sales of other additional shares would be subject to the same terms and conditions as set forth in the December 13, 2023 agreements.

282.    The settlement terms and conditions were memorized in a document entitled "Forward Purchase Agreement Confirmation Amendment dated August 29, 2024", which was referred to as an amendment to the "OTC Equity Prepaid Forward Transaction, dated as of December 13, 2023".

283.    To implement the settlement agreement, on August 30, 2024 Plaintiff issued 5,517,179 shares of Plaintiff's common stock to Defendant, Meteora Partners that at the time had a value of $1,806,324.40.

284.    To implement the settlement agreement, on August 30, 2024 Plaintiff issued to Meteora Select 4,940,681 shares of Plaintiff's common stock that at the time had a value of $1,617,578.96.

285.    To implement the settlement agreement, on August 30, 2024 Plaintiff issued to Meteora Strategic 1,935,142 shares of Plaintiff's common stock that at the time had a value of $633,565.49.

286.    Notwithstanding the settlement agreement with Meteora, and the issuance of the

shares as set forth herein, Defendants failed and refused to advance any funds to

Plaintiff.

287.    After multiple oral requests, on March 12, 2025 Plaintiff requested in writing a

$500,000 advance as provided for in the settlement agreement of August 29, 2024.

288.    Defendants advised Plaintiff that upon further issuance of its common stock to

Defendants, the requested advance of $500,000 would be made.

289.    By reason of the foregoing, on March 26, 2025 2,917,862 shares of Plaintiff's

common stock was transferred to Meteora Partners with a then value of $391,285.29.

290.    Despite entering into the amended agreement on August 29, 2024 Defendants

have refused to advance any money to plaintiff.

291.    From the date of the merger on February 2, 2024 to the present date, despite the

transfer of over 15,000,000 shares of Plaintiff's common stock to Defendants,

Defendants have never remitted any money to Plaintiff as required by the agreements

as amended.

**OTHER COMPANIES HAVE BEEN LURED INTO DEFENDANTS**
**FRAUDULENT SCHEME AND BEEN SIMILARLY DAMAGED**

**ROADZEN, Inc.**

292.    On about February 15, 2023 Vahanna, a SPAC and Roadzen, Inc., a privately held

company in the Global Insurance Technology business entered into an "Agreement and

Plan of Merger".

293.    Thereafter, but prior to August 25, 2023 Defendants proposed to Vahanna that it

enter into what Defendants called a "Forward Share Purchase Agreement".

294.    In fact what was proposed was for Vahanna after finalizing its merger with Roadzen to enter into the funding "Scheme" as set forth hereinabove.

295.    More particularly Defendants issued a term sheet to Vahanna in which the following proposal and representations were made:

a.  Meteora would acquire 5,000,000 SPAC shares for approximately $54,000,000;

b.  Meteora would pay to Vahanna at the closing of the shares of Roadzen stock combination [the merger] 2.5% of the transaction's value with "shortfall sales" no sooner than 30 days post-closing;

c.  Early termination of the funding agreement should the company get "delisted" from the exchange;

d.  Early termination of the funding agreement should the price of the stock trade below $2.00/share for 30 consecutive days;

e.  A commitment fee of 100,000 shares of the newly listed stock;

f.  A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price"];

g.  Defendant could not "short" the company securities;

h.  That the legal fee to be paid by Vahanna would be capped at $50,000.00;

i.  That Vahanna would transfer the "FSPA" proceeds, less the prepayment shortfall to Defendants' pre-segregated bank account

[basically the proceeds Defendants paid for the 5,000,000 shares as described above];

j.  Upon the sale of any shares by Defendants, Defendants would pay to Plaintiff the "reference price" per share sold [which in the initial written proposal was $10.00/share];

296.   Based upon the expected funding needs of the newly merged company, Vahanna and Roadzen agreed that the newly merged business should enter into the proposed funding agreement with Defendants.

297.   On or about August 25, 2023 Vahanna announced that its shareholders had approved the stock combination with Roadzen.

298.   Or about August 25, 2023 Defendants, Vahanna and Roadzen entered into a funding agreement that was described as a "Share Forward Transaction" or "Forward Purchase Agreement".

299.   The funding agreement entered into between Roadzen and  Defendants provided the following:

a.  Meteora would acquire 5,000,000 post-SPAC shares of Roadzen;

b.  that the number of shares held by Defendants would represent no more than 9.9% of the total Public float at the closing date of the merger;

c.  Early termination of the funding agreement should the company get "delisted" from the exchange;

d.  Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;

e.  A representation that Defendants could sell shares of the stock at any price, but would be required to pay Roadzen $10.76/share sold [which was designated the "reference price"];

f.  Defendant could not "short" the company securities;

g.  After the merger date the number of shares of stock Defendant was permitted to sell was limited;

h.  Defendant was required to give Roadzen written notice of all sales of stock within 5 business days;

i.  That the legal fee to be paid by Vahanna would be capped at $50,000.00;

j.  That Vahanna would transfer the sum of $46.19 million from the Vahanna trust account to Defendants' pre-segregated bank account which equaled the proceeds Defendants paid for the 5,000,000 shares as described above in which event Defendants' "cost-basis" in the shares held was $0.00;

k.  Upon the sale of shares by Defendants, Defendants were required to pay to Roadzen the "reference price" per share sold which was defined as $10.76/share;

l.  In the event share(s) were sold at a price in excess of the "reference price" of $10.76/share, Defendants would retain the excess proceeds of each such sale;

       m. In the event Defendants sold any share below the "reference price"
of $10.76/share, Defendant was still obligated to remit the sum of
$10.76/share to Roadzen;

       n. The number of shares Defendants could sell during the first 180
days following the closing were limited;

       o. The term of the agreement expired in March 2025 at which time
Roadzen would purchase from Defendants all remaining shares
held by Defendants at $1.25/share.

300.    Before the merger between Vahanna and Roadzen, Defendants purchased
Vahanna stock as provided for in the agreement.

301.    On or about September 20, 2023, the merger was completed, and the new merged
company was named Roadzen, Inc.

302.    Upon the merger of Vahanna and Roadzen, Defendants received 4,297,745
shares of the new merged company in exchange for the shares of the SPAC that it had
purchased pre-merger.

303.    To comply with the funding agreement with Defendants, 702,255 of restricted
shares of Roadzen were issued to Defendants, Meteora after which Defendants, Meteora
were holding 5,000,000 shares of Roadzen's shares.

304.     Meteora did not pay any cash to Roadzen for the issuance of the 702,255
additional shares.

305.    In compliance with the funding agreement with Defendants, Roadzen
paid back / reimbursed Defendants, Meteora the sum of $46,190,195.09 from the trust
fund that Meteora had spent for the purchase of 4,297,745 shares of the SPAC.

306.    As a result, Defendants were holding 5,000,000 shares of Roadzen at a $0.00 cost basis of which 4,297,745 were "unrestricted" shares and could be sold in the market immediately after the merger occurred and the shares were issued.

307.    In furtherance of Defendant's scheme, the number of unrestricted shares that were permitted to be sold following the merger were limited, resulting in a limited supply.

308.    While Defendants held approximately 9.9% of the issued stock of Roadzen, Defendants held an overwhelming majority of unrestricted shares of Roadzen stock that could be sold on the NASDAQ exchange and therefore had significant control over the "float" of the stock and had the ability to move the stock price.

309.    Initially after the merger on September 20, 2023, the  share price of Roadzen on the NASDAQ exchange went up to as high as $17/share.

310.    From the date of the merger and transfer of the shares of Roadzen Stock to Defendants, Meteora on or about September 20, 2023 until September 30, 2023 Defendants, Meteora sold 206,763 shares of Roadzen stock.

311.    Meteora remitted to Roadzen $10.76 per share for the sale of the 206,763 shares sold as contemplated in the agreements.

312.    From October 1, 2023 until December 31, 2023 Defendants, Meteora sold 3,386 shares of Roadzen stock.

313.    Roadzen has instituted a lawsuit against Defendants in the USDC, Southern District of New York [Case No. 25-cv-07867 (JPO)(GS)] (the "Roadzen USDC case") in which Roadzen alleges, that Defendant's sold its shares in the market and failed to remit

funds to Roadzen as was required by the agreements between the Roadzen and the Defendants herein.

314.    In the Roadzen USDC case, Roadzen alleges that Defendants repeatedly misrepresented to Roadzen the number of its shares that were held by Defendants to obscure the fact that Defendants had sold shares in the market that had not been disclosed to Roadzen as required by the agreements between said parties.

315.    In the Roadzen USDC case, Roadzen alleges that Defendants failed and refused to disclose to Roadzen the number of shares sold and the price received for the sale of each share sold including but not limited to the sales that would require payment to Roadzen.

316.    In the Roadzen USDC case, Roadzen alleges that when it was unaware that Defendants had sold unreported stock from the stock Defendants held and was unaware of the amount that Roadzen was entitled to receive from Defendants, Roadzen began questioning Defendants with regard to disclosure of the funds received by Defendants for the sale of Roadzen stock.

317.    To deflect their failure to remit the proper funds to Roadzen, in the Roadzen USDC case, Roadzen alleges that at Meteora's "suggestion",  on about January 30, 2024 Roadzen and Defendants, entered into an amendment to their funding agreement, that was titled: "Forward Purchase Agreement Confirmation Amendment ( the "Amendment").

318.    The amendment to the funding agreement between Roadzen and Defendants provided that:

    a. notwithstanding the share price on the NASDAQ exchange,
     Roadzen could request advances of funds up to a total of $5

million in $500,000 increments on an as requested basis (the same

proposal that was made to Solidion in the August 29, 2024

amendment in settlement of the lawsuit);

b.  Defendants were required to advance the requested funds to

Roadzen; and

c.  Defendants were thereafter permitted to sell sufficient shares of the

Roadzen stock that was being held in escrow at the then market

price to reimburse itself for the money it advanced to Plaintiff plus

a 17% "fee". (this was the same structure that was incorporated

into the amendment with Solidion in the August 29, 2024

Amendment is settlement of the lawsuit except the fee in this case

was 20% over and above the reimbursement of advanced funds).

319.    Unlike in the case with Solidion where Defendants never advance funds as

provided for in the agreement, Defendants did advance some funds to Roadzen.

320.    However, like with Solidion, there came a time that Defendants failed and refused

to advance the funds as requested by Roadzen when Defendants were aware of the

immediate need Roadzen had for the funds to meet immediate operating expenses.

321.    The public 13F filings with the SEC by Meteora with respect to its stock

ownership of Roadzen revealed the following:

| Effective date of filing | Date 13F filed | #shares held by Meteora |
|---|---|---|
| 9/30/2023 | 11/13/2023 | 4,090,982 shares |
| 12/31/2023 | 2/14/2024 | 4,087,596 shares. |
| 3/31/2024 | 5/14/2024 | 4,625,311 shares. |
| 6/30/2024 | 8/14/2024 | 4,026,221 shares |

| | | |
|---|---|---|
| 9/30/2024 | 11/14/2024 | 3,138,628 shares |
| 12/31/2024 | 2/14/2025 | 2,091,102 shares. |
| 3/31/2025 | 5/15/2025 | 1,267,163 shares |

322.    From the date of the Roadzen merger on September 26, 2023 to the signing of the amendment agreement with Meteora on January 30, 2024,  Defendants clearly failed to remit the proper amount of money to Roadzen as required by the agreements between Roadzen and Defendants.

323.    In the Roadzen USDC case, Roadzen alleges that the Defendants herein had sold shares of Roadzen and failed to remit to Roadzen the total sum of $28,465,192.64.

324.    In the Roadzen USDC case, Roadzen alleges that the Defendants do not deny that the shares of Roadzen were sold, that Defendants received payment for the sale of shares of Roadzen and that Defendants did not remit the full payment to Plaintiff as provided by the Agreements between the parties.

**OTHER COMPANIES HAVE BEEN LURED INTO DEFENDANTS FRAUDULENT SCHEME AND BEEN SIMILARLY DAMAGED**

**ALTERNUS**

325.    Prior to October 12, 2022 Clean Earth Acquisition Corp (" Old Alternus"), a Delaware registered company was formed as a SPAC for the purpose of acquiring an operating business or merging with an operating business or acquiring the assets of an operating business.

326.    On about October 12, 2022 Clean Earth Acquisition Corp (" Old Alternus") a Delaware registered company and Alternus Energy Group Plc ("Alternus-Ireland"), a transatlantic clean energy power producer, registered in Ireland and publicly traded on various European stock exchanges entered into a "Business Combination Agreement",

which agreement was amended on April 12, 2023 in which various United States assets of Alternus-Ireland would be transferred to "Old Alternus", Old Alternus's name would be changed from Clean Earth Acquisition Corp to Alternus Clean Energy Inc. ("New Alternus"), 80% of the shares of stock of Old Alternus would be transferred to Alternus-Ireland and New Alternus would become listed on the NASDAQ exchange.

327.    Thereafter, but prior to December 3, 2023 Defendants proposed to "Old Alternus" that it enter into what Defendants called a "Forward Share Purchase Agreement".

328.    In fact what was proposed was for Old Alternus, after finalizing the proposed "Business Combination" with "Alternus Ireland" to enter into the funding "Scheme" as set forth hereinabove.

329.    More particularly Defendants issued a term sheet to Old Alternus in which the following proposal and representations were made:

        a.   Meteora would acquire approximately 3,000,000 SPAC shares [shares of Old Alternus] on the open market;

        b.   Old Alternus would be required to pay an early termination fee should the company get "delisted from the exchange;

        c.   Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;

        d.   A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price" or the "shortfall price"];

        e.   Defendant could not "short" the company securities;

    f.   That the legal fee to be paid by Vahanna would be capped at $50,000.00;

    g.   That New Alternus would transfer back to Defendants' designee the proceeds Defendants paid for the 3,000,000 shares [as described above]; and

    h.   Upon the sale of shares by Defendants, Defendants would pay to Plaintiff the "reference price" ["shortfall price'] of $10.00 per share sold;

330.    Or about December 3, 2023 Defendants, Old Alternus and Alternus Ireland entered into a funding agreement that was described as a "Share Forward Transaction".

331.    The funding agreement entered into with Defendants provided the following:

    a.   Meteora would acquire 3,000,000 SPAC shares;

    b.   That the number of shares held by Defendants would represent no more than 9.9% of the total public float at the closing date of the merger.

    c.   Early termination of the funding agreement should the company get "delisted" from the exchange;

    d.   Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;

    e.   A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price" and also sometimes referred to as the "Prepayment Shortfall"] during the first 90 days after New

Alternus began trading on the NASDAQ exchange and Defendants were permitted to retain any excess proceeds of each sale;

f. Defendant could not "short" the company securities;

g. Defendant could sell shares during the first 90 days following the date the company began trading on the NASDAQ exchange so long as the sale price was in excess of $10.00/share.

h. Defendants agreed to advance $500,000.00 to New Alternus upon consummation of the Forward Funding Agreement.

i. After the first 90 days, Defendants were permitted to sell shares to reimburse themselves sufficiently to repay Defendants the $500,000.00 advanced plus a 17% fee and was required to give New Alternus written notice of the sale within 5 business days;

j. After Defendants were reimbursed for the $500,000.00 "advanced" plus 17%, Defendants were prohibited from selling any further shares for less than $10.00/share unless and until New Alternus agreed to change the "reference price/prepayment shortfall".

k. That the legal fee to be paid by Old Alternus would be capped at $50,000.00;

l. Old Alternus would transfer the sum Defendants paid to acquire the shares of Old Alternus as described above in which event Defendants' "basis" in the shares held was $0.00;

332. Before the business combination closing between Alternus-Ireland and "Old\

Alternus", Defendants purchased 2,896,554 shares of Old Alternus as provided for in the agreement.

333.    On or about December 23, 2023, the Business combination was completed, and the company was renamed "Alternus Clean Energy, Inc." (" New Alternus").

334.    Upon the completion of the combination, Defendants received the agreed to shares of the newly formed company in exchange for the shares of the SPAC that it had purchased pre-merger.

335.    In compliance with the funding agreement with Defendants, New Alternus paid/reimbursed Defendants, Meteora the sum it had purchased the SPAC shares of Old Alternus.

336.    As a result, Defendants were holding New Alternus shares at a $0.00 cost basis.

337.    New Alternus began trading on the NASDAQ exchange on or about December 26, 2023.

338.    While Defendants held approximately 9.9% of the issued stock of "New Alternus", Defendants and Alternus-Ireland held 80% of the issued shares of "New Alternus" , Defendants therefore had significant control over the "float" of the stock.

339.    Initially after the business combination closed, the  share price of Plaintiff on the NASDAQ was expected to open and did open at approximately $5.00/share.

340.    Based upon the oral representations made by Defendants, which were incorporated in the agreements between the parties, New Alternus had a reasonable expectation that Defendants would not be selling shares of stock in the market during the first 90 days after trading began on the NASDAQ exchange less than the price of

$10.00/share in which event Defendants would remit to New Alternus the sum of $10.00 per share, which funds would be available for use as operating capital by New Alternus.

341.    Based upon the representations and circumstances surrounding the agreements, Defendants knew that Plaintiff was relying upon Defendants not to sell any shares of New Alternus during the first 90 days after trading began on the NASDAQ exchange less than the price of $10.00/share unless and until the share price was above $10.00 per share.

342.    Based upon the representations and circumstances surrounding the agreements, Defendants knew that Plaintiff was relying upon Defendants not to sell any shares of New Alternus after the first 90 days after trading began on the NASDAQ exchange except to reimburse Defendants for the $500,000.00 advanced to New Alternus plus the 17% fee unless the share price exceeded $10.00/share.

343.    Defendants knew that it was reasonable for New Alternus to rely upon Defendants representations that Defendants were going to sell shares in the market when the share price was above $10.00 per share.

344.    Defendants knew that New Alternus expected Defendants to disclose that Defendants were selling shares in the market when the share price was above $10.00 per share and that Defendant would remit those funds to New Alternus.

345.    It was reasonable that New Alternus expected Defendant to report the sales of the shares of stock it was holding in escrow to New Alternus.

346.    It was reasonable that New Alternus expected Defendants to remit to New

Alternus the sum of $10.00/share for every share that Defendants sold other than those shares sold after 90 days of trading to reimburse Defendants for the advanced $500,000.00 and 17% fee.

347.     Defendants were aware that New Alternus was relying upon the funds expected to receive from Defendants pursuant to the agreements upon the sale of the shares of New Alternus that Defendants were holding pursuant to the above-described scheme.

348.     Notwithstanding the reasonableness of the foregoing and Defendants' knowledge of the reasonableness of the foregoing, Defendants never intended to remit the funds to New Alternus as it sold shares of stock that it was holding pursuant to the outlined "scheme".

349.     Notwithstanding the reasonableness of the foregoing and Defendants' knowledge of the reasonableness of the foregoing, Defendants intended to sell the shares of New Alternus without disclosing the sales to New Alternus.

350.     The representations made by Defendants orally and in the agreements were false.

351.     Defendants knew that the foregoing representations were false.

352.     Defendants knew that the New Alternus was relying upon the truth of the representations and as a result New Alternus was induced into entering into the stock arrangement as outlined hereinabove.

353.     In fact, Defendants did sell shares of New Alternus's stock in the market when the share price was above $10.00 per share.

354.     Defendant's failed to remit any funds to New Alternus based upon the sale of shares in the market as was required by the agreements between the parties.

355.     By reason of the foregoing, New Alternus was damaged.

356.    In addition to the foregoing, contrary to the agreement with New Alternus, Defendants sold an excess number of shares to the point that Defendants sale of shares significantly affected the market price of New Alternus shares.

357.    As a result of Defendants stock manipulation, the price of the New Alternus stock decreased below $1.00 per share.

358.    The price per share of New Alternus stock never rebounded and never sold above the pre-agreed strike price of $10.00 per share.

359.    Upon information and belief Defendants sold shares of New Alternus's during the first 90 days after trading began on December 26,2023 in which it received in excess of $1,000,000.00.

360.    Defendant did not remit any of the revenue received from the sales of New Alternus stock.

361.    Defendants intentionally failed and/or refused to advise New Alternus of the sales of stock to New Alternus.

362.    Initially Defendants denied having sold any shares of New Alternus during the first 90 days then later admitted to selling shares.

363.    By reason of the foregoing, New Alternus was unaware of the sale of shares by Defendants and was unaware that Defendants has failed to pay New Alternus over $1,000,000 pursuant to the agreements between the parties.

364.    At no time did Defendants remit any money to New Alternus as required by the agreement between the parties.

365.    As provided for in the agreements except for those shares sold for the purposes of

reimbursing Defendant for the funds advanced to New Alternus as permitted in the agreement, plus the 17% fee to defendants, all other shares sold by defendants required defendant to remit to New Alternus $10.00 per share.

366.    Upon information and belief, Defendants do not deny that shares of New Alternus were sold, that Defendants received payment for the sale of shares of New Alternus and that Defendants did not remit the payment to Plaintiff.

367.    Upon information and belief, Defendants have embarked on and implemented the scheme as outlined and set forth hereinabove, tailored to specific circumstances as required by the circumstances of the SPAC's arrangements/agreements with the targeted operating company.

368.    More specifically, Defendants embarked upon and implemented a scheme whereby they gained control of shares in newly public companies post-SPAC merger at a zero-cost basis.

369.    More specifically, in furtherance of the scheme, the shares obtained by Defendants from post-SPAC merged companies were unrestricted.

370.    More specifically, in furtherance of the scheme, Defendants represented to their "targets" that when they sold the "Target's" shares, Defendants would remit a pre-agreed price per share to the "Target".

371.    More specifically, the agreement entered into with each of its targets permitted Defendants to retain all proceeds of the sale of the "Target's" shares in excess of the pre-agreed price per share Defendants were required to remit to the "Target".

372.    More specifically, while Defendants were not prohibited from selling shares of

the "Target" below the pre-agreed price, regardless of the actual sale price, Defendants were contractually required to remit to the "Target" the per share pre-agreed price.

373.    Notwithstanding the foregoing, pursuant to the scheme, Defendants sold shares of the "Target" regardless of the then market price, did not disclose the sales to the "Target" and did not remit the funds from the sale of stock to the "Target".

374.     Defendants repeatedly lied and misrepresented to "targets" about how many shares they owned to obscure the fact that they had made sales of shares and profited from such sales.

375.    The result of the foregoing scheme was that the "target's" market share price was materially damaged, and the "targets" had not received any compensation due from the sales of such shares.

376.    Additional "targets" of Defendants' scheme shall be identified in discovery of this action, which, upon information and belief will include the business arrangement between Defendants and "Ocean Biomedical, Inc.", which dispute is presently pending before Judge Anar Patel in the Supreme Court of the State of New York, County of New York.

377.    The entire "funding scheme" as set forth in more detail hereinabove was a carefully thought out and implemented plan and scheme to evade compliance with the federal securities laws, including without limitation the prohibition on manipulative and deceptive practices under the exchange act.

378.    The individually named Defendants who were officers members, managing

members and partners of the "business named" Defendants {"Meteora"}were fully

aware and complicit in proposing and implementing the foregoing detailed plan and

scheme.

379.    Plaintiff relied upon the foregoing representations made by Defendants in

furtherance of the plan and scheme as set forth in more detail hereinabove in entering into

the funding agreement with Defendants.

380.    Defendant knew that Plaintiff was relying upon those representations in entering

into the funding agreement with Defendants.

381.    Plaintiffs reliance on the foregoing representations was reasonable.

382.    Defendants knew that Plaintiffs reliance on the foregoing representations was

reasonable.

383.    Defendants knew that the forgoing representations were false when made.

384.    Plaintiff entered into the foregoing funding agreements to its detriment.

385.    Defendants made the foregoing representations to induce Plaintiff into entering

into the funding agreements with Defendants.

386.    By reason of Plaintiff's reliance on the foregoing Plaintiff has been damaged.

**FIRST CAUSE OF ACTION**
**(FRAUD and FRAUD in the INDUCEMENT)**
**(Against all Meteora Defendants and**
**Defendants Mittal , Levy, Gahwyler and Rogano)**

387.    Plaintiff repeats, realleges and reiterates each and every allegation

contained in paragraphs "1" through "386" as though fully set forth herein.

388.    By reason of the foregoing, Defendants fraudulently induced Nubia, Honeycomb

and Solidion to enter into the Funding Agreements as Amended.

389.    By reason of the foregoing, Mittal fraudulently induced Nubia, Honeycomb and Solidion to enter into the Funding Agreements as Amended.

390.    By reason of the foregoing, Levy fraudulently induced Nubia, Honeycomb and Solidion to enter into the Funding Agreements as Amended.

391.    By reason of the foregoing, Gahwyler fraudulently induced Nubia, Honeycomb and Solidion to enter into the Funding Agreements as Amended.

392.    By reason of the foregoing, Rogano fraudulently induced Nubia, Honeycomb and Solidion to enter into the funding agreements as amended.

393.    Mittal intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove including but not limited to:

    a.  Selling Solidion shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

    b.   In fraudulently entering into the Amendment to the Forward Purchase Agreement as a settlement to the lawsuit instituted against Plaintiff to induce Plaintiff to include Defendants in the PIPE financing when Defendant never intended to advance the funds to Plaintiff as required by the Amendment, which provision was an integral element of the settlement between Plaintiff and Defendants;

    c.  In fraudulently manipulating the Solidion stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or

           significantly increasing Plaintiff's obligation to Defendant that was

           required to be made at the termination of the contract;

d.  In creating a windfall profit to Defendants; and

e.  In manipulating the stock sales to create a net gain to Defendants

      to the detriment of Plaintiff.

394.    Levy intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

a.  Selling Solidion shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

b.  In fraudulently entering into the Amendment to the Forward Purchase Agreement as a settlement to the lawsuit instituted against Plaintiff to induce Plaintiff to include Defendants in the PIPE financing when Defendant never intended to advance the funds to Plaintiff as required by the Amendment, which provision was an integral element of the settlement between Plaintiff and Defendants;

c.  In fraudulently manipulating the Solidion stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

      d.  In creating a windfall profit to Defendants; and

      e.  In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

395.    Gahwyler intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

      a.  Selling Solidion shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

      b.  In fraudulently entering into the Amendment to the Forward Purchase Agreement as a settlement to the lawsuit instituted against Plaintiff to induce Plaintiff to include Defendants in the PIPE financing when Defendant never intended to advance the funds to Plaintiff as required by the Amendment, which provision was an integral element of the settlement between Plaintiff and Defendants;

      c.  In fraudulently manipulating the Solidion stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

      d.  In creating a windfall profit to Defendants; and

      e.   In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

396.    Rogano intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

      a.   Selling Solidion shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

      b.   In fraudulently entering into the Amendment to the Forward Purchase Agreement as a settlement to the lawsuit instituted against Plaintiff to induce Plaintiff to include Defendants in the PIPE financing when Defendant never intended to advance the funds to Plaintiff as required by the Amendment, which provision was an integral element of the settlement between Plaintiff and Defendants;

      c.   In fraudulently manipulating the Solidion stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

      d.   In creating a windfall profit to Defendants; and

      e.   In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

397.    Defendants, Meteora intentionally induced Plaintiff to enter into the funding

Agreements as amended with the intent to defraud Plaintiff as more fully set forth

hereinabove, including but not limited to:

    a.  Selling Solidion shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

    b.  In fraudulently entering into the Amendment to the Forward Purchase Agreement as a settlement to the lawsuit instituted against Plaintiff to induce Plaintiff to include Defendants in the PIPE financing when Defendant never intended to advance the funds to Plaintiff as required by the Amendment, which provision was an integral element of the settlement between Plaintiff and Defendants;

    c.  In fraudulently manipulating the Solidion stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

    d.  In creating a windfall profit to Defendants; and

    e.  In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

398.    Solidion relied upon the representations made by Meteora, Rogano, Mittal,

Levy and Gahwyler that Meteora would remit payments to Plaintiff upon every sale of Solidion stock sold by Defendants.

399.    Solidion's reliance upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler that Defendants would remit payment to Plaintiff for every sale of Solidion stock sold was reasonable under the circumstances.

400.    Defendants knew that the foregoing representations were false when made.

401.    Defendants knew that the ongoing representations that Defendants had not been selling shares of Solidion stock was false.

402.    Defendants knew that the foregoing representations were false when made.

403.    Defendants knew that Plaintiff was relying upon those representations as true.

404.    Defendants knew that Plaintiffs reasonably relied upon those false representations made by Defendants.

405.    Mittal was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

406.    Levy was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

407.    Gahwyler was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

408.    Rogano was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

409.    By reason of the foregoing, Plaintiff was fraudulently induced into entering the business arrangement with Defendants as more fully set forth herein.

410.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined

at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses

of this lawsuit.

411.    By reason of the foregoing, Plaintiffs demand punitive damages against all

Defendants plus reasonable legal fees and the costs and disbursements of bringing this

action.

<strong><u>SECOND CAUSE OF ACTION</u></strong><br/>
<strong><u>(MISREPRESENTATION)</u></strong><br/>
<strong><u>(Against all Meteora Defendants and</u></strong><br/>
<strong><u>Defendants Mittal , Levy, Gahwyler and Rogano)</u></strong>

412.    Plaintiff repeats, realleges and reiterates each and every allegation

contained in paragraphs "1" through "411" as though fully set forth herein.

413.    Defendants, individually and jointly, both orally and in writing made a series of

representations to Plaintiff to induce Plaintiff to enter into the initial funding agreement

and thereafter the amendment to the funding agreement some of which have been set

forth in detail hereinabove.

414.    The representations made by Defendants include but are not limited to the

following:

a.  That in exchange for Defendants, Meteora assisting in the de-
    SPAC process [which included a. purchasing shares of the  SPAC;

b.  After the merger, assisting in the forward funding of Plaintiff;

c.  The return of 100% of the funds advanced/paid by Meteora for the
    SPAC shares thus resulting in a $0.00 cost basis for Meteora and in
    exchange thereof, Defendants promised and represented both in
    writing and orally that Meteora would from time to time sell shares

of Solidion stock that Defendants were holding in escrow and pay

to Plaintiff for each share that it sold;

d.  That Defendants would notify Plaintiff every time it sold shares of

Solidion stock;

e.  That, notwithstanding the fact that in excess of 12,000,000 shares

of stock were issued to Defendants, Meteora, Defendants would

remit funds in accordance with the December 13, 2023

agreements, which they have failed and refused to do;

f.  Defendants represented that as sophisticated lenders, investors and

participants in funding "post SPAC" companies, had the expertise

and knowledge as to when and in what amounts sales of stock

could be accomplished without significantly affecting the stock

price and at the same time provide the funding that Plaintiff

required post de-SPAC;

g.  In connection with the Amendment to the Funding Agreement,

Defendants promised and represented to Plaintiff that it would

"advance" to Plaintiff advances in tranches of $500,000 in

exchange for Plaintiff's consent to permit Defendants to sell a

portion of the shares of Solidion stock that Meteora had been

issued after Meteora had recovered the amounts advanced plus

20%, and all further shares sold would require the payment of

pursuant to the December 13, 2023 agreements;

415.    Notwithstanding the foregoing representations, Defendants sold Solidion stock

without paying to Plaintiff as promised and represented.

416.    Notwithstanding the foregoing representations, Defendants failed and refused to advise Plaintiff every time they sold shares of Solidion stock.

417.    Notwithstanding the foregoing representations, Defendants intentionally withheld information regarding its sales of Solidion stock.

418.    Notwithstanding the foregoing representations, Defendants sales of Solidion stock had a significant negative impact on the price of Solidion stock post "de-SPAC".

419.    Notwithstanding the foregoing representations, Defendants manipulated the Solidion stock to Plaintiff's detriment and to Defendants intended and calculated "benefit".

420.    Notwithstanding the foregoing representations, Defendants failed and refused to advance the funding as provided in the Amendment to the Funding Agreement to Plaintiff's detriment.

421.    By reason of the foregoing misrepresentations, Rogano induced Solidion to enter into the Funding Agreement as Amended.

422.    By reason of the foregoing misrepresentations, Mittal induced Solidion to enter into the Funding Agreement as Amended.

423.    By reason of the foregoing misrepresentations, Levy induced Solidion to enter into the Funding Agreement as Amended.

424.    By reason of the foregoing misrepresentations, Gahwyler induced Solidion to enter into the Funding Agreement as Amended.

425.    By reason of the foregoing misrepresentations, Meteora induced Solidion to enter

into the funding agreements as amended.

426.    Defendant, Mittal, knew that the foregoing representations were false when made.

427.    Defendant, Mittal, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

428.    Defendant, Mittal knew that Plaintiff's reliance on the foregoing representations was reasonable.

429.    Defendant, Mittal intentionally made the foregoing misrepresentations with the intent to cause Solidion to enter into the Funding Agreement as Amended with the intent to defraud New Solidion as more fully set forth hereinabove.

430.    Defendant, Levy knew that the foregoing representations were false when made.

431.    Defendant, Levy, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

432.    Defendant, Levy knew that Plaintiff's reliance on the foregoing representations was reasonable.

433.    Defendant, Levy intentionally made the foregoing misrepresentations with the intent to cause Solidion to enter into the Funding Agreement as Amended with the intent to defraud Solidion as more fully set forth hereinabove.

434.    Defendant, Gahwyler knew that the foregoing representations were false when made.

435.    Defendant, Gahwyler, knew that Plaintiff was relying upon the truthfulness of the

foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

436.    Defendant, Gahwyler knew that Plaintiff's reliance on the foregoing representations was reasonable.

437.    Defendant, Gahwyler intentionally made the foregoing misrepresentations with the intent to cause Solidion to enter into the Funding Agreement as Amended with the intent to defraud Solidion as more fully set forth hereinabove.

438.    Defendant, Rogano knew that the foregoing representations were false when made.

439.    Defendant, Rogano, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

440.    Defendant, Rogano knew that Plaintiff's reliance on the foregoing representations was reasonable.

441.    Defendant, Rogano intentionally made the foregoing misrepresentations with the intent to cause Solidion to enter into the Funding Agreement as Amended with the intent to defraud Solidion as more fully set forth hereinabove.

442.    Defendant, Meteora knew that the foregoing representations were false when made.

443.    Defendant, Meteora, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

444.    Defendant, Meteora knew that Plaintiff's reliance on the foregoing representations

was reasonable.

445.    Defendant, Meteora intentionally made the foregoing misrepresentations with the intent to cause Solidion to enter into the Funding Agreement as Amended with the intent to defraud Solidion as more fully set forth hereinabove.

446.    Solidion relied upon the foregoing representations made by Meteora, Rogano, Mittal, Levy and Gahwyler.

447.    Solidion's reliance upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler was reasonable under the circumstances.

448.    Based upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler, Plaintiff, Solidion entered into the funding agreements as amended.

449.    As the person who arranged for the financing of the foregoing acquisition, Mittal devised and orchestrated the foregoing scheme.

450.    As the person who arranged for the financing of the foregoing acquisition, Levy devised and orchestrated the foregoing scheme.

451.    As the person who arranged for the financing of the foregoing acquisition, Gahwyler devised and orchestrated the foregoing scheme.

452.    As the person who arranged for the financing of the foregoing acquisition, Rogano devised and orchestrated the foregoing scheme.

453.    By reason of the misrepresentations set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Solidion, in failing to notify Plaintiff of sales of stock when made, in failing to advance funds to Solidion when

requested, and in manipulating the stock price of Solidion stock, Solidion was damaged in an amount to be determined at trial.

454.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

455.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

### THIRD CAUSE OF ACTION
### (Declaratory Judgement-Piercing the Corporate Veil)
### (Against all Meteora Defendants and
### Defendants Mittal , Levy, Gahwyler and Rogano)

456.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "455" as though fully set forth herein.

457.    Rogano exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Solidion as more fully set forth hereinabove.

458.    Mittel exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Solidion as more fully set forth hereinabove.

459.    Levy exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Solidion as more fully set forth hereinabove.

460.    Gahwyler exercised complete domination of Meteora in perpetrating the

foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Solidion as more fully set forth hereinabove.

461.    The foregoing domination was used by Rogano to perpetrate and commit the fraud and wrongdoing against Plaintiff, Solidion as more fully set forth hereinabove.

462.    The foregoing domination was used by Mittal to perpetrate and commit the fraud and wrongdoing against Plaintiff, Solidion as more fully set forth hereinabove.

463.    The foregoing domination was used by Levy to perpetrate and commit the fraud and wrongdoing against Plaintiff, Solidion as more fully set forth hereinabove.

464.    The foregoing domination was used by Gahwyler to perpetrate and commit the fraud and wrongdoing against Plaintiff, Solidion as more fully set forth hereinabove.

465.    Rogano utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Solidion.

466.    Mittal utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Solidion.

467.    Levy utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Solidion.

468.    Gahwyler utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Solidion.

469.    The Meteora "corporate entities" were the "alter ego" of Rogano with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Solidion to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

470.    The Meteora "corporate entities" were the "alter ego" of Mittal with regard to his

actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Solidion to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

471.    The Meteora "corporate entities" were the "alter ego" of Levy with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Solidion to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

472.    The Meteora "corporate entities" were the "alter ego" of Gahwyler with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Solidion to enter into the Funding Agreements as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

473.    By reason of the foregoing the Meteora corporate form should be disregarded to achieve an equitable result.

474.    By reason of the foregoing Defendant, Rogano should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Solidion.

475.    By reason of the foregoing Defendant, Mittal should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Solidion.

476.    By reason of the foregoing Defendant, Levy should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Solidion.

477.    By reason of the foregoing Defendant, Gahwyler should be personally responsible

for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Solidion.

478.   By reason of the foregoing, Plaintiffs request that this Court, as a Court of equity prevent the wrong committed upon Plaintiffs and issue a declaratory judgment declaring that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended between Meteora and Solidion.

**FOURTH CAUSE OF ACTION**
**(BREACH OF CONTRACT)**
**(Against all Meteora Defendants and**
**Defendants Mittal , Levy, Gahwyler and Rogano)**

479.   Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "478" as though fully set forth herein.

480.   Plaintiff, Solidion has complied in all respects with the terms and conditions of the funding agreement as amended with Defendants, Meteora.

481.   Defendant, Meteora has breached multiple terms and conditions of the Funding Agreement as amended with Plaintiff, Solidion as more fully set forth hereinabove, including but not limited to:

a. Defendants', Meteora's failure to pay Plaintiff as required under the agreements,

b. Meteora's failure to report sales of Solidion stock to Plaintiff,

c.  Meteora's failure and refusal to fund Solidion as provided in the amendment to the funding agreement; and

d. Meteora's wrongful manipulation of the Solidion stock resulting in its market loss.

482.    By reason of the foregoing, Defendants Meteora breached the Funding Agreements as Amended.

483.    On the condition that this Honorable Court grants Plaintiff, Solidion's application for a Declaratory Judgement that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach of the funding agreements as amended between Meteora and Solidion, Plaintiff, Solidion demands judgment against each corporate/business Defendant as well as against each individually named Defendant jointly and severally for the breach of the funding agreements as amended.

484.    By reason of the breach of contract as more fully set forth herein and the wrongful conduct of the Defendants as more fully set forth herein, New Solidion was damaged in an amount to be determined at trial.

485.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

<u>**FIFTH CAUSE OF ACTION**</u>
**<u>(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)</u>**
**<u>(Against all Meteora Defendants and</u>**
**<u>Defendants Mittal , Levy, Gahwyler and Rogano)</u>**

486.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "485" as though fully set forth herein.

487.    Within the Funding Agreements as Amended, there is an implied covenant of

good faith and fair dealing.

488.    Defendants owe and owed Plaintiff, Solidion a duty to act in good faith and

conduct the business affairs with Plaintiff in a fair and equitable manner.

489.    Defendants breached the duty by engaging in transactions that drove down the

market price of Solidion shares and further failed to conduct themselves and

itself consistent with the terms and conditions of the Funding Agreement as

Amended.

490.    Plaintiff, Solidion reasonably expected that Defendants would not

engage in transactions as set forth hereinabove, which is implicit in the Funding

Agreements as Amended.

491.    Defendants' breach of the implied covenant of good faith and fair dealing

proximately caused New Solidion to suffer damages in an amount to be determined

at trial.

492.    By reason of the breach of covenant of good faith and fair dealing as more fully

set forth herein and the wrongful conduct of the Defendants in causing and directing

Meteora to cease making the payments required pursuant to the funding agreements as

amended with Solidion, Solidion was damaged in an amount to be determined at trial.

493.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined

at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses

of this lawsuit.

494.    By reason of the foregoing, Plaintiffs demand punitive damages against all

Defendants plus reasonable legal fees and the costs and disbursements of bringing this

action.

**SIXTH CAUSE OF ACTION**
**(ACTION PURSUANT TO 18 USC §§ 1961-1968 {RICO CLAIM})**
**(Against Defendants Mittal, Levy, Rogano and Gahwyler)**

495.    Plaintiff repeats, realleges and reiterates each and every allegation contained in

paragraphs "1" through "494" as though fully set forth herein.

496.    Meteora is an enterprise as defined in the RICO statutes.

497.    Rogano is an officer of Meteora.

498.    Rogano is an employee of Meteora.

499.    Rogano is an equity owner of Meteora.

500.    Rogano is a member of Meteora.

501.    Rogano is a managing member of Meteora

502.    Rogano is a member of the Board of Directors of Meteora.

503.    Rogano exercises and exercised management and control over Meteora.

504.    Mittal is an officer of Meteora.

505.    Mittal is an employee of Meteora.

506.    Mittal is an equity owner of Meteora.

507.    Mittal is a member of Meteora.

508.    Mittal is a managing member of Meteora

509.    Mittal is a member of the Board of Directors of Meteora.

510.    Mittal exercises and exercised management and control over Meteora.

511.    Levy is an officer of Meteora.

512.    Levy is an employee of Meteora.

513.    Levy is an equity owner of Meteora.

514.    Levy is a member of Meteora.

515.    Levy is a managing member of Meteora

516.    Levy is a member of the Board of Directors of Meteora.

517.    Levy exercises and exercised management and control over Meteora.

518.    Gahwyler is an officer of Meteora.

519.    Gahwyler is an employee of Meteora.

520.    Gahwyler is an equity owner of Meteora.

521.    Gahwyler is a member of Meteora.

522.    Gahwyler is a managing member of Meteora

523.    Gahwyler is a member of the Board of Directors of Meteora.

524.    Gahwyler exercises and exercised management and control over Meteora.

525.    Each of the individual named Defendants, acted in their respective

capacity as an employee and/or officer and/or director and/or member and/or managing

member and/or equity owner of Meteora.

526.    Each of the individual named Defendants participated in the wrongful

conduct on behalf of Meteora, as more fully set forth hereinabove.

527.    The Racketeering conduct alleged herein is the fraudulent conduct set

forth hereinabove.

528.    The pattern of racketeering activity alleged hereinabove includes but is not

limited to the ongoing fraudulent policies and practice of the individual Defendants:

a.    Utilizing the Meteora "enterprise" to fraudulently induce Plaintiff
     to enter into the Funding Agreements as Amended;

b.     Utilizing the Meteora "enterprise" to induce the owners of those
      shares of Solidion stocks to enter into what appeared to be a

lucrative funding agreement as amended with Meteora, as set forth above;

c.  Utilizing the Meteora "enterprise" to then fabricate claims that Plaintiff breached the Funding Agreements as Amended;

d.  Misrepresenting that Defendants would fund Plaintiff utilizing the Solidion stock Defendants Meteora were holding as collateral security with a $0.00 basis to Defendants Meteora, selling that stock in the market and remitting payment to Plaintiff,  when it fact Defendants had no intention of remitting any payment to Plaintiff thereby breaching the Funding Agreements as Amended and in fabricating other "reasons" that Meteora should not honor the terms and conditions of the Funding Agreement as Amended;

e.  Utilizing the Meteora "enterprise" to fabricate reasons why Meteora should not honor the terms and conditions of the Funding Agreements as Amended; and

f.  Utilizing the Meteora "enterprise" to obtain the assets of multiple shares of Solidion stock without costs including the cost of continuing the funding of Plaintiff, Solidion.

529.    Further, the pattern of racketeering activity and the fraudulent policies and conduct of the Defendants as set forth in great detail hereinabove, has been ongoing since at least February 2024 and upon information and belief is still ongoing.

530.    The result of the foregoing pattern of racketeering activity and the

fraudulent policies and conduct of the Defendants, as set forth hereinabove was that Plaintiff, Solidion, has been damaged in the sum in excess of $10,000,000.00 and have been caused to incur substantial legal fees and expenses.

531.    The foregoing policies orchestrated by the Defendants has been and continues to be ongoing and repetitive as demonstrated hereinabove by the multiple specific transactions identified in detail hereinabove that followed the same and/or similar pattern again and again.

532.    As set forth hereinabove, Defendants have implemented the same or similar scheme on other companies including but not limited to Roadzen, Alternus and Oceans Biomedical as set forth hereinabove.

533.    By reason of the repeated conduct and the wrongful conduct of the Defendants, as set forth hereinabove, there is every reason to believe that without court intervention, the conduct of the Defendants shall continue indefinitely into the future.

534.    The foregoing policy was part and parcel of the fraudulent conduct and scheme by Defendants to induce Solidion to enter into the Funding Agreement as amended as well as induce other businesses seeking to "go public" to be lured into the same or similar "Funding Scheme" as set forth hereinabove.

535.    The damages as set forth herein were proximately caused by the violations of the RICO statutes (18 USC §§1961-1968 and more particularly 18 USC § 1965)

536.    By reason of the foregoing, Plaintiff was damaged as more fully set forth herein which was caused by the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Solidion and withholding material information from Plaintiff, including

the fact that Defendants wrongfully and in violation of the Funding Agreements as Amended failed to advise Plaintiff that Defendants were selling Solidion stock and further promised to advance funding to Plaintiff.

537.    The foregoing was a Racketeering activity as described and set forth by the RICO statutes.

538.    The Fraud, Fraud in the Inducement and Misrepresentation violations as set forth hereinabove were incidental and tangential to the sale of securities as defined in SEC v Zandford [535 U.S. 813, 153 L.Ed.2d 1, 122 S.Ct. 1899].

539.    It is a question of fact for a jury to determine whether the facts as alleged herein are a "security transaction or a "commercial lending transaction".

540.    It is a question of law to determine whether the facts as alleged herein are a "security transaction or a "commercial lending transaction".

541.    Upon information and belief the same facts as set forth herein can be interpreted as being based on a "security transaction" and a "commercial lending transaction" at the same time as defined in Bixler [596 F3d 751].

542.    The issue of whether the facts and circumstances as set forth herein is a "security transaction" or a "commercial lending transaction" and whether the issue is a question of fact or a question of law are issues  of "First Impression" .

543.    Solidion was damaged in an amount to be determined at trial.

544.     By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

545.    By reason of the foregoing, Plaintiff demands punitive damages against all

Defendants plus reasonable legal fees and the costs and disbursements of bringing this

action.

546.     Pursuant to the RICO statutes, Plaintiff hereby demands treble damages

plus attorney's fees and the costs of this lawsuit.

### SEVENTH CAUSE OF ACTION
### (ACTION PURSUANT TO 15 USC § 77q(a)
### (Against all Meteora Defendants and
### Defendants Mittal , Levy, Gahwyler and Rogano)

547.     Plaintiff repeats, realleges and reiterates each and every allegation contained in

paragraphs "1" through "546" as though fully set forth herein.

548.     15 USC §77(q)(a) provides as follows:

(a) **USE OF INTERSTATE COMMERCE FOR PURPOSE OF FRAUD OR DECEIT:**
It shall be unlawful for any person in the offer or sale of any securities
(including security-based swaps) or any security-based swap agreement (as
defined in section 78c(a), (78) of this title) by the use of any means or instruments
of transportation or communication in interstate commerce or by use of the mails,
directly or indirectly—

**(1)**
to employ any device, scheme, or artifice to defraud, or
**(2)**
to obtain money or property by means of any untrue statement of a material fact or any
omission to state a material fact necessary in order to make the statements made, in light
of the circumstances under which they were made, not misleading; or
**(3)**
to engage in any transaction, practice, or course of business which operates or would
operate as a fraud or deceit upon the purchaser.

549.     15 USC §78(b) sets forth in detail the necessity of this regulation.

550.     By reason of the facts as set forth hereinabove, Defendants have violated 15 USC

§77(q)(a).

551.     As set forth more fully hereinabove, Defendants have employed a scheme to

defraud Plaintiff.

552.    As set forth more fully hereinabove, the scheme devised by Defendants was devised to obtain money unfairly, illegally and improperly by means of untrue statements of material fact, particularly in light of the circumstances under which they were made.

553.    As set forth more fully hereinabove, Defendants have engaged in a transaction and course of business which operates as a fraud and deceit upon the Plaintiff, Solidion.

554.    The damages as set forth herein were proximately caused by the violations of 15 USC §§77q(a),

555.    By reason of the foregoing, as more fully set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Solidion, Solidion was damaged in an amount to be determined at trial.

556.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

557.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

### EIGHTH CAUSE OF ACTION
### (CAUSE OF ACTION PURSUANT TO 15 USC §78(j), and 17 USC §§240.10b-5 and 240.10(b))
### [STOCK MANIPULATION]
### (Against all Meteora Defendants and
### Defendants Mittal , Levy, Gahwyler and Rogano)

558.    Plaintiff repeats, realleges and reiterates each and every allegation

contained in paragraphs "1" through "557" as though fully set forth herein.

559.    15 USC §78(j)(b) provides as follows:

"…It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors…"

560.    17 USC § 240.10b-5 [a/k/a SEC Rule 10b-5] provides as follows:

"Employment of Manipulative and Deceptive Devices"

"…It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security…"

561.    SEC Rule 10b-5 prohibits fraud in connection with the purchase or sale of a

security.

562.    Pursuant to SEC Rule 10b-5, fraud can occur in purchases made on a stock

exchange.

563.    As set forth hereinabove, New Solidion stock was and is listed and traded on the

NASDAQ exchange.

564.    The contracts entered into between Defendants and Plaintiff was a "securities based swap agreement".

565.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is manipulative in contravention of SEC Rule 10b-5 and 10(b).

566.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is a deceptive device in contravention of SEC Rule 10b-5 and 10(b).

567.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is a contrivance in contravention of SEC Rule 10b-5.

568.    Defendants employed the foregoing described "Scheme" to defraud Plaintiff.

569.    As more fully set forth hereinabove, Defendants made untrue statements both orally and in writing of material facts in connection with their manipulation of New Solidion stock.

570.    As more fully set forth hereinabove, Defendants omitted material facts in furtherance of the fraud, fraud in the inducement and misrepresentation causes of action set forth hereinabove, including but not limited to the fact that Defendants omitted notifying Plaintiff that it was selling shares of New Solidion stock without Plaintiff's knowledge, without notifying Plaintiff as required by the Funding Agreements as Amended and in furtherance of the scheme to manipulate the New Solidion stock.

571.    Defendants engaged in a course of business in furtherance of the above stated scheme which operated as a fraud upon any Plaintiff in connection with the sale of New Solidion securities.

572.    As set forth in the facts hereinabove, Defendants manipulated the Solidion stock to Defendants' benefit and to Plaintiff's detriment.

573. As more fully set forth hereinabove, Defendants made misstatements and omissions of material facts to induce Plaintiff to enter into the Funding Agreements as Amended.

574. As more fully set forth hereinabove, Defendants made the foregoing misstatements and omissions of material facts with "scienter", that is with knowledge and awareness of the nature of their actions and the circumstances surrounding the forgoing wrongful actions.

575. As more fully set forth hereinabove, Defendants made the foregoing misstatements and omissions of material facts in connection with the purchase or sale of securities.

576. As more fully set forth hereinabove, Defendant made the foregoing misstatements and omissions of material facts knowing that Plaintiff was relying upon those statements of material fact as true.

577. The proximate cause of the damages sustained and alleged herein by Plaintiff was by reason of Plaintiff's reasonable reliance upon those statements and upon Plaintiff's good faith and reasonable belief that Defendants were acting in good faith and would not have omitted to advise Plaintiff of material facts, which, as set forth herein was the proximate cause of damages asserted herein.

578. By reason of the facts as set forth hereinabove, Defendants have violated 15 USC §77(q)(a).

579. As set forth more fully hereinabove, Defendants have employed a scheme to defraud Plaintiff.

580. As set forth more fully hereinabove, the scheme devised by Defendants was

devised to obtain money unfairly, illegally and improperly by means of untrue statements of material fact and manipulation of the stock price,  particularly in light of the context and circumstances under which they were made.

581.    As set forth more fully hereinabove, Defendants have engaged in a transaction and course of business which operates as a fraud and deceit upon the Plaintiff, Solidion.

582.    The damages as set forth herein were proximately caused by the violations of 15 USC §77q(a).

583.    The damages as set forth herein were proximately caused by violations of the 17 USC §240.10b-5 [SEC Rule 10b-5].

584.    By reason of the foregoing, as more fully set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to fail to make the payments required pursuant to the funding agreements as amended with Plaintiff, Solidion, Solidion was damaged in an amount to be determined at trial.

585.     By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

586.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

### NINTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)
### (Against all Meteora Defendants and
### Defendants Mittal , Levy, Gahwyler and Rogano)

587.    Plaintiff repeats, realleges and reiterates each and every allegation

contained in paragraphs "1" through "586" as though fully set forth herein.

588.    Plaintiff, Solidion has complied in all respects with the terms and conditions of the Funding Agreement as amended with Defendants, Meteora.

589.    Defendant, Meteora has breached multiple terms and conditions of the Agreements with Plaintiff, Solidion as more fully set forth hereinabove, including but not limited to Defendants failure to pay Plaintiff as required under the agreements, Defendants failure to advise Plaintiff when shares of stock were sold, Defendants, Meteora's failure to advance funds as required under the Funding Agreement as amended, and Defendants wrongful manipulation of the Solidion stock resulting in its market loss.

590.    By reason of the foregoing, Defendants Meteora breached the Funding Agreements as Amended.

591.    By reason of the foregoing, Defendants have been unjustly enriched.

592.    On the condition that this Honorable Court grants Plaintiff, Solidion's application for a Declaratory Judgement that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach of the funding agreements as amended between Meteora and Solidion, Plaintiff, Solidion demands judgment against each Defendant jointly and severally for the breach of the funding agreements as amended and thereby have been individually unjustly enriched.

593.     By reason of the foregoing as more fully set forth herein and the wrongful

conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Solidion resulting, Solidion was damaged in an amount to be determined at trial.

594.    By reason of the foregoing, Defendants Meteora, Rogano, Mittal, Levy and Gahwyler have been unjustly enriched.

595.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $10,000,000.00 plus interest and cost and expenses of this lawsuit.

596.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

**FIRST CAUSE OF ACTION**:

Fraud and Fraud in the Inducement as against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**SECOND CAUSE OF ACTION:**

Misrepresentation as against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys

fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**THIRD CAUSE OF ACTION:**

Declaratory Judgment declaring that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler each be jointly and severally personally responsible and liable for all Causes of Action asserted herein.

**FOURTH CAUSE OF ACTION**:

Breach of Contract against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**FIFTH CAUSE OF ACTION:**

Breach of Covenant of Good Faith and Fair Dealing against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and

expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**SIXTH CAUSE OF ACTION**:

Violations of the RICO statutes (18 USC §§1961-1968) against all Defendants and particularly against Defendants, Rogano, Mittal, Levy and Gahwyler: Pursuant to the RICO Statute, Plaintiff, SOLIDION demands damages in the sum of $10,000,000 plus interest, attorneys fees and costs and expenses of the litigation against Defendants, Rogano, Mittal, Levy and Gahwyler. Pursuant to the RICO statute, Plaintiff, Solidion demands treble damages in an amount to be determined at trial but in no event less than treble the damages proved at trial believed to be a total of $30,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants;

**SEVENTH CAUSE OF ACTION**: Violations of the 15 USC §77(q)(a) against against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**EIGHTH CAUSE OF ACTION**:   Violations of the 15 USC §78(j) and 17 USC §240.10b-5 against against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the

litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**NINTH CAUSE OF ACTION**:

Unjust Enrichment against all against **all Meteora Defendants and Defendants Mittal , Levy, Gahwyler and Rogano**. Plaintiff, SOLIDION demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Solidion demands damages in an amount to be determined at trial but in no event less than $10,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

And Such other and further relief as to this Court may deem just and proper.

Dated: New York, New York
        December 11, 2025

Schrier Shayne, P.C.

s/Richard E. Schrier
Richard E. Schrier, Esq.
262 W. 38th Street
New York, New York 10018
212-566-4949/516-739-8000
resincourt@shaynelawgroup.com